# In the United States Court of Federal Claims

No. 19-1888 C
Filed: October 28, 2021

|  |  |
|---|---|
| MATTHEW BANKS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

*Matthew Banks*, Sugarcreek Township, OH, *pro se*.

*Evan Wisser*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were *Ethan P. Davis*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Elizabeth M. Hosford*, Assistant Director, of counsel, for the Defendant. *Paulette D. Jenkins*, United States Department of the Navy, Office of the Judge Advocate General, Tort Claims Unit Norfolk, of counsel.

## OPINION AND ORDER

**MEYERS, Judge.**

There are few, if any, cases that come before this Court that are as difficult to resolve as those involving veterans that have served our country with distinction for many years but feel wronged by the Military that they served. And these cases are more difficult when the plaintiff has, in fact, been wronged. Here, Mr. Banks undoubtedly faced and overcame improper treatment during his service in the Marine Corps, as the Marine Corps' Inspector General found, and he now claims that this continued mistreatment forced him to involuntarily resign from the Marine Corps. Under settled law, however, a resignation is presumed voluntary unless the plaintiff can show that he was coerced to resign, resigned under duress, or resigned due to misrepresentations by the Military. And the plaintiff must overcome a very strong presumption that his resignation was voluntary. Here, although Mr. Banks alleges, and the Inspector General found, significant improper conduct directed at him, his claims do not overcome the strong presumption that his resignation was voluntary. The Court is compelled to grant the Government's motion to dismiss in almost all respects. But the Court denies the Government's motion insofar as Mr. Banks does sufficiently allege that the Marine Corps violated its own regulation that compelled it to retain him on active duty through the completion of medical treatment so long as he gave his written consent. It is undisputed that Mr. Banks was undergoing medical treatment and submitted a written *request* to be retained so that he could complete

medical treatment, but the Marine Corps did not retain him.  In this circumstance, the Court finds it most prudent to remand this matter to the Board for Correction of Naval Records ("BCNR") to determine how long Mr. Banks would have been kept on active duty given his medical treatment and how much active duty pay that would entitle him to.

## I.    Background[1]

On August 31, 2018, Matthew Banks was honorably discharged as a Major of the United States Marine Corps.  From May 2001 to June 2009, he was in the reserves.  Banks was on active duty as a judge advocate from June 2009 to August 2018.  *See* ECF No. 14 ¶¶ 1-2.

In July 2013, then-Captain Banks had returned from Afghanistan and filed a complaint with the Inspector General of the Marine Corps ("IGMC") against his supervisor, Colonel Fifer, for alleged misconduct.  This alleged misconduct included assault, battery, abuse of authority, hazing, and discrimination that Banks alleged occurred from October 2012 to June 2013 during Banks's pre-deployment training and subsequent deployment to Afghanistan.  *Id.*  ¶¶ 4-6, 14, 29, 31, 35.  Banks alleged to the IGMC that before deployment, Colonel Fifer "made his negative feelings about Banks being African American known to the office," once sprayed *only* Banks "**in the groin with a water hose** . . . to elicit laughter from Banks's peers," and directed Banks "to carry the **'Blue Falcon' award**[2] . . . for two weeks during a deployment exercise where the entire headquarters would see this statute [sic] . . . ."  *Id.* ¶¶ 30-31, 33.  Additionally, Colonel Fifer's deputy, "hung a picture of a **black spade** in [Colonel] Fifer's office and referred to a black child as a '**tar baby**' to elicit laughter from [Colonel] Fifer."  *Id.* ¶ 32.  In his IGMC complaint, however, Banks did not include any allegations against Fifer's deputy.  *See id.* ¶ 32 n.12.  During deployment, Colonel Fifer "**hit[] Banks in the head with his knuckles**," threw objects at Banks, struck Banks's back with an object, and attempted on several occasions to demonstrate that Banks was "untrustworthy and/or incompetent[.]"  *Id.* ¶ 34.

Following his IGMC complaint, Banks asserts that the Marine Corps retaliated against him for being a whistleblower.  He alleges he faced eight unlawful "retaliatory investigations . . . almost continuously between January 2016 until his discharge in August 2018 . . . ."  *Id.* ¶ 336.  He also says he experienced harassment, discrimination, increased duties, and withheld favorable personnel and employment actions.  *See* ECF No. 20 at 7-8 (citing ECF No. 14 ¶¶ 35-61, 69-192, 223-29, 238-55, 260-62, 283-92, 331-43).

In early 2018, Banks began speaking with several private law firms about potential employment if he chose to leave the Marine Corps.  ECF No. 14 ¶¶ 193-222; 256-59.  Around this same time, Banks was informed by Major Reese, who was responsible for Marine lawyer transfers, that he would likely be transferred during the summer of 2018.  *Id.* ¶ 30.  The discussion of Banks's potential transfer came after Banks told superiors about his father's

---

[1] Because this is a motion to dismiss, these facts are drawn from Plaintiff's complaint and supporting documents and presumed to be true for the resolution of the pending motions.

[2] The term "Blue Falcon" is military jargon for "Buddy F***er" and is used to portray "someone [as] not to [be] trust[ed]."  ECF No. 14 ¶ 54 n.17.  The "award" appears to have been a statue of a bird painted blue.

declining health and the difficulty in finding an assisted living facility for him. *Id.* ¶ 234. On May 2, 2018, Banks submitted his request to resign and requested an effective date of August 31, 2018. *Id.* ¶¶ 236-37.

In August 2018, Banks had his final physical while in the Marine Corps. *Id.* ¶ 263. During this physical, Banks learned that he would need a surgical procedure. *Id.* In the last few days of August 2018, Banks made various attempts to either withdraw his resignation or delay his discharge so that he could have the surgical procedure and recuperate while still in the Marine Corps. *Id.* ¶¶ 264-82. Banks alleges that he did everything he was told to do in this process to ensure the Marine Corps would retain him through the procedure and recouperation. *Id.* The Marine Corps did not, however, retain Banks through his surgery or recouperation and discharged him on August 31, 2018. *Id.* ¶ 282.

## II.     Jurisdiction & Standard of Review

### A.     Jurisdiction

The Tucker Act, 28 U.S.C. § 1491(a)(1), gives this Court authority to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." Tucker Act jurisdiction requires "a separate money-mandating statute the violation of which supports a claim for damages against the United States." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (noting that this additional requirement is based upon sovereign immunity principles). A money-mandating statute is "*reasonably amenable* to the reading that it mandates a right of recovery in damages." *Fisher v. United States*, 402 F.3d 1167, 1173-74 (Fed. Cir. 2005). The Military Pay Act, 37 U.S.C. § 204, "serves as the money-mandating statute applicable to military personnel claiming damages and ancillary relief for wrongful discharge." *Holley,* 124 F.3d at 1465 ("If the discharge was wrongful the statutory right to pay continues; this right serves as the basis for Tucker Act jurisdiction."). The Military Pay Act affords active-duty members of a uniform service an entitlement "to the basic pay of the pay grade to which assigned or distributed, in accordance with their years of service . . . ." 37 U.S.C. § 204(a)(1).

Generally, a *pro se* plaintiff's complaint is held to "less stringent standards . . . ." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (quoting *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). But a *pro se* plaintiff must establish this Court's jurisdiction. *See Kelley v. Sec'y, U.S. Dep't of Labor*, 812 F.2d 1378, 1380 (Fed. Cir. 1987) ("We agree that leniency with respect to mere formalities should be extended to a *pro se* party, . . . [h]owever, . . . a court may not similarly take a liberal view of that jurisdictional requirement and set a different rule for *pro se* litigants only."). Although Banks is a practicing attorney, the Court has reviewed his pleadings thoroughly to discern his legal arguments; however, he must meet his jurisdictional burden. *See id*. "*Pro se* or not, the plaintiff still has the burden of establishing by a preponderance of the evidence that this Court has jurisdiction over its claims." *Rothing v. United States*, 132 Fed. Cl. 387, 390 (2017) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "Although a litigant has the right to act as his or her own attorney, it is well established that the right of self representation is not a license to fail to comply with the applicable rules of

procedural and substantive law." *Walsh v. United States*, 3 Cl. Ct. 539, 541 (1983) (citing *Faretta v. California*, 422 U.S. 806, 834 n.46 (1975)).

Banks brings his involuntary separation action under the Military Pay Act. *See* ECF No. 14 ¶ 1.[3] His requests for monetary and equitable relief include an award of backpay, allowances, and benefits; either an adjustment of his date of retirement or reinstatement; and other ancillary relief. *See id.* Prayer for Relief. The voluntariness of a service member's separation from the military is "not jurisdictional; rather, a question that should be considered in the context of the merits of a plaintiff's case in determining whether a plaintiff can take advantage of § 204's money-mandating status." *Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006)[4]; *see also House v. United States*, 99 Fed. Cl. 342, 347 (2011) (acknowledging that when claiming an involuntary separation from military service, a plaintiff may invoke the Military Pay Act), *aff'd*, 473 F. App'x 901 (Fed. Cir. 2012). Accordingly, this Court has jurisdiction over Banks's claims and will review them on the merits.

## B.   Standard of Review

### 1.   Motion to Dismiss under RCFC 12(b)(6)

When evaluating a motion under Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"), the Court assumes the veracity of any complaint's well-pleaded factual allegations, drawing all reasonable inferences "that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Based on these allegations, the Court "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.* at 679. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" *Twombly*, 550 U.S. at 555 (internal citation omitted). When making its determination, the Court may look beyond the complaint's allegations and consider "matters incorporated by reference or integral to the claim, items subject to judicial

---

[3] Banks in his amended complaint states that he is "a Marine Corps whistleblower and former Marine lawyer, [who] brings this action for wrongful discharge under the 'Military Pay Act,' *10 U.S.C. § 1034*." ECF No. 14 ¶ 1 (emphasis added and footnote omitted). Although expressly stating that this action is under the Military Pay Act, Banks cites to the statutory provision for the Military Whistleblower Protection Act (MWPA). *See* 10 U.S.C. § 1034. But this Court has no jurisdiction over MWPA claims. *See Bias v. United States*, 722 F. App'x 1009, 1014 (Fed. Cir. 2018) ("Indeed, no judicial review is available under the MWPA because Congress precluded alternative fora by providing a specific form of redress in the statute."). Because the Parties have fully briefed the case under the assumption that it is under the Military Pay Act and Banks acknowledges that "no court has jurisdiction over a Military Whistleblower Protection Act claim[,]" the Court will read the above statement as the "Military Pay Act, [37 U.S.C. § 204]." ECF No. 14 ¶¶ 1, 143.

[4] This does not mean that the Court should not consider whether Banks states a claim for which relief may be granted under RCFC 12(b)(6).

notice, [and] matters of public record." *A&D Auto Sales, Inc., v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)). Under RCFC 12(b)(6), the Court must dismiss a complaint that fails to "plausibly allege the required elements" for any claims. *Kam-Almaz v. United States*, 682 F.3d 1364, 1369 (Fed. Cir. 2012).

## III.   Discussion

### A.   Banks must rebut the presumption that his resignation was voluntary.

The key question before the Court is whether Banks's resignation from the Marine Corps was voluntary. *See Kim v. United States*, 47 Fed. Cl. 493, 497 (2000) ("The question for the Court is whether the plaintiff exercised a free choice in making the decision to retire or resign."). And it is well-established that "[w]here a member of the military resigns or retires, his decision is presumed to be voluntary." *House*, 99 Fed. Cl. at 347 (citations omitted). And "[t]his presumption will prevail unless plaintiff comes forward with sufficient evidence to establish that the resignation was involuntarily extracted." *Christie v. United States*, 207 Ct. Cl. 333, 338 (1975). To prevail, therefore, Banks "must satisfy a demanding legal standard." *Staats v. U.S. Postal Serv.*, 99 F.3d 1120, 1124 (Fed. Cir. 1996). If a plaintiff fails to rebut this presumption, the Court must dismiss the claims. *See, e.g.*, *Kim*, 47 Fed. Cl. at 496-97. After all, a "freely made" resignation from the military "may not be revoked or withdrawn, even via court order." *House*, 99 Fed. Cl. at 347. But a plaintiff may show an *involuntary* resignation, and thereby vitiate the presumption that the resignation was voluntary, if the resignation stemmed from: (1) duress or coercion; (2) government officers' misrepresentation or deception, *Tippett v. United States*, 185 F.3d 1250, 1255 (Fed. Cir. 1999), *abrogated on other grounds by Metz*; (3) time pressure; or (4) an unsuccessful withdrawal before the effective date. *Bergman v. United States*, 28 Fed. Cl. 580, 585 (1993). The Court will address each in turn because Banks presents claims on each of these grounds.

#### 1.   Banks fails to state a claim under duress or coercion.

Banks argues that his resignation was the result of duress or coercion. ECF No. 14 ¶¶ 331-43. To prevail, he must meet all three prongs of the *Fruhauf* test considering all the facts and circumstances. *See Kim*, 47 Fed. Cl. at 497.[5] The *Fruhauf* test prongs are: "(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party." *Fruhauf Sw. Garment Co. v. United States*, 126 Ct. Cl. 51, 62 (1953) (citing *United States v. Bethlehem Steel Corp.*, 315 U.S. 289, 301 (1942) and *French v. Shoemaker*, 81 U.S. (14 Wall.) 314, 332 (1871)). And "the Federal Circuit recognize[s] the applicability of the involuntariness analysis of civilian personnel separations . . . to military personnel separations." *Lynn v. United States*,

---

[5] The Federal Circuit uses both the "*Fruhauf* test" and "*Christie* test" to describe the same three-part test. *Compare Garcia v. Dep't of Homeland Sec.*, 437 F.3d 1322, 1329 (Fed. Cir. 2006) (en banc) (noting the Federal Circuit's adoption of the "so-called *Fruhauf* test") *with Carmichael v. United States*, 298 F.3d 1367, 1376 (Fed. Cir. 2002) (addressing "the remaining two factors in the *Christie* test"). Following the en banc opinion in *Garcia*, the Court refers to it as the *Fruhauf* test.

58 Fed. Cl. 797, 804 (2003).  The Court measures duress or coercion "by an objective evaluation of all the facts and circumstances." *Carmichael v. United States*, 298 F.3d 1367, 1372 (Fed. Cir. 2002).

Banks's argument that *Carmichael* allows him to succeed on his duress or coercion claim, by demonstrating only the Government's wrongful conduct (*i.e.*, the third prong of the *Fruhauf* test) fails.  *See* ECF No. 22 at 31-33; *see also* ECF No. 23 at 6 n.1 (collecting cases). Simply put, *Carmichael* does not eliminate the first two *Fruhauf* prongs.  Rather, Carmichael found error in the trial court's holdings on the first two prongs.  *Carmichael*, 298 F.3d at 1376-77; *see also House*, 99 Fed. Cl. at 350 ("The Federal Circuit thereby left little doubt that a finding of wrongfulness on the part of the defendant would not, standing alone, require this court to find that [the service member's] retirement was involuntary.").  Therefore, the three-prong *Fruhauf* test "controls even where there is wrongful government conduct."  *House*, 99 Fed. Cl. at 350 (stating that evidence of the Government's wrongful conduct "only satisfies the third prong").  But the Government's wrongful conduct "*may* constitute coercive action" to satisfy the third element because "[a]n action is not voluntary if it is produced by government conduct which is wrongful." *Carmichael*, 298 F.3d at 1372 (emphasis added) (quoting *Roskos v. United States*, 213 Ct. Cl. 34, 40 (1977) (collecting cases)).

Here, neither party focuses their argument on the first prong.  Instead, Banks focuses on the third prong, for which he has alleged considerable facts to show wrongful conduct by the Marine Corps.  The Government, solely for purposes of its motion to dismiss, concedes that Banks has plausibly alleged sufficient facts to satisfy the third *Fruhauf* prong.  ECF 23 No. 23 at 7.  But the Government focuses on the second prong, which requires a showing that Banks had no alternative but to resign.  *Id.* at 7-8.  And because the test is conjunctive, the Government contends that Banks cannot satisfy *Fruhauf* and, therefore, cannot state a claim.  *Id.* at 10-11. Therefore, the Court begins its analysis with the second *Fruhauf* prong.

### a)  Banks had a free choice and decided to resign.

The second *Fruhauf* prong requires Banks to show that his *only* option was to resign because he had no realistic alternative.  As Judge Allegra explained, "the question here is not whether resignation was the best option, but whether it was the *only* option."  *House*, 99 Fed. Cl. at 352.  And even where a plaintiff faces termination proceedings and subjectively "perceived no alternative but to tender [a] resignation . . . plaintiff chose to resign and accept discontinued service retirement rather than challenge the validity of [the] proposed discharge for cause.  The fact remains, *plaintiff had a choice*.  [He] could 'stand pat and fight.'"  *Garcia*, 437 F.3d at 1329 (quoting *Christie*, 518 F.2d at 587).  Choosing not to fight is still a choice.  Indeed, proving a lack of choice is difficult because the presumption of voluntariness remains even if one's "choice [is] limited to one of two unpleasant alternatives."  *House*, 99 Fed. Cl. at 348; *see also Bergman*, 28 Fed. Cl. at 585 ("This presumption endures even if the plaintiff is confronted with 'a choice of unpleasant alternatives.'") (quoting *Sammt v. United States*, 780 F.2d 31, 33 (Fed. Cir. 1985)). And the alternatives can, in fact, be quite unpleasant but still present a choice.  Even a resignation "to avoid a court-martial or other serious discipline" is deemed voluntary.  *House*, 99 Fed. Cl. at 348 & n.7 (collecting cases).  Thus, any alternative, even if incredibly unpleasant with unknown outcomes, is deemed an option other than resigning.

Banks says he had no "practical or realistic alternative" other than resignation.  ECF No. 14 ¶ 334.  The Government counters that he *chose* not to "stand pat and fight."  ECF No. 20 at 14 (quoting *Christie*, 207 Ct. Cl. at 338).  The Government further asserts that Banks knew of several unexhausted options.  ECF No. 23 at 10.  Banks retorts that the Government's coercion through deception made it an impossible fight.  ECF No. 22 at 41.  Banks presents six reasons why he had no realistic alternative.  ECF No. 14 ¶ 334.  But even when drawing all reasonable inferences in the light most favorable to him, each reason fails.

First, Banks asserts that revocation of a security clearance may cause an involuntary separation.  *Id.* ¶ 334.  While true, this does not make Banks's resignation involuntary because he alleges no facts demonstrating that he ever lost or faced a realistic likelihood of losing *his* security clearance.  *See id.* ¶ 151.

Second, he insists that "continued retaliatory investigations would have resulted in involuntary discharge and an adverse characterization of service."  *Id.* ¶ 334.  Yet each of these investigations ended either favorably or without any finding at all.  *See id.* ¶¶ 50-53, 146-51, 162-71, 187-92, 223-29, 245-55, 336.  And given Banks's exemplary record of service, there is no indication that he faced a realistic probability of a negative outcome from future investigations (if any).  But in the event of adverse findings, a reasonable person in Banks's position could choose to challenge them instead of resigning.  As our predecessor court held, "[o]n the contrary plaintiff could have stood firm and opposed the security investigation . . . .  He still maintains that all accusations of wrongdoing against him were false.  In these circumstances, a claim of duress cannot be sustained."  *Murphy v. United States*, 209 Ct. Cl. 352, 364 (1976) (applying the *Fruhauf* test).  Banks concedes that Marines must cooperate in official investigations and that "he had nothing to hide."  ECF No. 14 ¶ 229.  If, resigning rather than face an imminent or pending court martial is voluntary, then choosing not to fight a hypothetical investigation must also be voluntary and cannot suffice to establish duress.  *House*, 99 Fed. Cl. at 348 & n.7.

Third, Banks maintains that he had no choice because of withheld favorable personnel actions and due to his increased duties and responsibilities commensurate with his pay grade and rank.  ECF No. 14 ¶¶ 334, 337-38.  However, these alleged actions and changes to his workload are "like thousands of other routine personnel decisions regularly made by the services which are variously held nonjusticiable or beyond the competence or the jurisdiction of courts to wrestle with."  *Voge v. United States*, 844 F.2d 776, 780 (Fed. Cir. 1988) (citing among others *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)).  Although "a normally nonjusticiable decision is not insulated from judicial review if it flows directly from the breach of a statute or regulation[,]" *Roth*, 378 F.3d at 1386, after carefully reviewing Banks's pleading the Court finds no such breach sufficiently alleged.  For example:

- Banks specifies that he expected to receive the "*typical* award" for his tour of duty for his rank.  ECF No. 14 ¶ 117 (emphasis added).  And Banks alleges that he was the only attorney to receive a downgraded award.  *See id.* ¶¶ 119.  Even though it appears that this awarding was discretionary, Banks reasonably could have challenged this downgrading.  Instead, he served without challenging his award.  *See id.* ¶¶ 116-22, 236.

- Banks alleges that the Government improperly withheld a Top Secret ("TS") clearance.  *See id.* ¶¶ 146, 338.  But "[i]t should be obvious that no one has a 'right' to a security

clearance." *Dep't of Navy v. Egan*, 484 U.S. 518, 528-29 (1988). And as explained above, there is no allegation that Banks lost the Secret security clearance that he had. But it is the *revocation* of the Secret clearance that would result in the involuntary separation of a Marine officer, not the withholding of a TS clearance. *See* ECF No. 14 ¶ 151; ECF No. 22 at 40 (citing SECNAVINST 1920.6D, Enclosure (6) ¶ 1(b)(15)).

- Banks insists that Mr. Lattin retaliated against him by advising the BCNR to reject his request for correcting personnel records with respect to "qualifying years" for retirement. ECF No. 14 ¶¶ 238-44. But this could not have led to his involuntary resignation because submitted his resignation on May 2, 2018. *Id.* at ¶ 236. He did not apply to the BCNR until May 22, 2018, and the BCNR did not convene a board until 2019. *Id.* ¶¶ 238-44. In short, anything Mr. Lattin may have done advising the BCNR came after Banks resigned and could not have impacted his decision.

- Banks alleges that he lacked the opportunity to use the knowledge obtained from his LL.M. degree in environmental law. *Id.* ¶¶ 323. Even though there was an open "environmental position" there, *id.* ¶ 111, it was within the discretion of the Marine Corps to choose his assignment for its convenience. *See Orloff v. Willoughby*, 345 U.S. 83, 93 (1953). And nothing required the Marine Corps to assign Banks to environmental law. In this same respect, the Marine Corps was not limited to providing Banks with only duties and responsibilities related to his LL.M. field of expertise. *See* ECF No. 14 ¶¶ 84-106. Banks does not allege that his assigned position, as opposed to environmental law position, made his resignation involuntary.

Fourth, Banks alleges that the Marine Corps failed to rate him according to his actual performance. *See id.* ¶ 339. Here, he alleges that if he had not resigned, he would have been passed over for promotion and separated from the Marine Corps. *Id.* ¶ 329. But this is wholly speculative. Banks's rating states that he should be promoted at the next opportunity, which was not for several years after he retired.[6] *Id.* ¶ 289. But the prospect of being passed over for promotion several years in the future, even if realistic, cannot make a resignation involuntary.

Fifth, Banks alleges that he had no realistic alternative to resignation because the Marine Corps was planning to transfer him even though it knew his father could not be moved and was ill. Here, the Marine Corps transferred Banks to Washington, D.C. at his request in 2016 because his father was ill and Washington was the closest Marine Corps facility to his father. *Id.* ¶¶ 110, 122. Critically, however, Banks alleges only that in April 2018 the Marines Corps informed him that it "would likely move Banks" out of Washington in the summer of 2018. *Id.* ¶ 233. And Banks believes that his superiors knew that he could not leave his father, who was too ill to move by May 2018. *Id.* ¶ 334; ECF No. 22 at 46. Even though Banks believed that the Government was forcing him out with a potential transfer, *see id.* ¶ 334, his "subjective evaluation of the scenario is not the yardstick" for the Court's objective evaluation. *Bergman*, 28 Fed. Cl. at 586. Because Banks alleges his resignation was coerced based on a "likely" transfer

---

[6] To be eligible for promotion to Lieutenant Colonel, Banks (and any other Marine) must serve at least 3 years as a Major. *See* 10 U.S.C. § 14303(b)(1). Banks was promoted to Major on October 1, 2015. ECF No. 14 ¶ 68 n.24. Thus, Banks was not eligible for promotion until October 2018.

that never resulted from a transfer order, ECF No. 14 ¶ 233, his allegations, taken as true, do not establish coercion.

Sixth, Banks alleges that he had no realistic alternative to resignation because the Marine Corps continuously told his succession of supervisors about his IGMC complaint and impeded his effort to gather evidence of retaliation by denying or ignoring his Freedom of Information Act (FOIA) requests. ECF No. 14 ¶¶ 78-83, 114-15, 172-86, 334, 339-40. The Government counters that Banks had the option to ask the IGMC to "investigate his claims of retaliation." ECF No. 23 at 10. This appears to be a viable choice given the heavy burden Banks must overcome to show his resignation was involuntary. Here too, if choosing to resign rather than face a court-martial is voluntary, resigning without challenging improper conduct cannot surmount the presumption of voluntariness. *E.g.*, *Sinclair v. United States*, 66 Fed. Cl. 487, 494 (2005) (finding that a former Army officer who resigned in lieu of a court martial had a realistic alternative of seeking additional investigation); *House*, 99 Fed. Cl. at 348. Plus, Banks had no apparent threat of disciplinary action. *See* ECF No. 23 at 7 ("[T]he fact that Mr. Banks suffered no adverse employment actions during his entire career demonstrates that he had realistic alternatives to resignation.").

Although not explicitly listed, the Court reads the complaint to assert additional reasons Banks had no realistic alternative to resigning. Banks alleges that he faced issues with his workplace environment, including discrimination, harassment, and ostracization. *See* ECF No. 14 ¶ 342. Even assuming this to be true, a voluntary resignation may occur in the midst of patterns of harassment and wrongful government conduct. ECF No. 23 at 9. After all, "not every unpleasant working arrangement or distasteful set of alternatives constitutes duress or renders an otherwise voluntary act involuntary." *Roskos*, 549 F.2d at 1389 (citing *Christie*, 207 Ct. Cl. at 338). The Federal Circuit in *Stephens v. Department of Agriculture*, 157 F. App'x 286 (Fed. Cir. 2005), observed that "[i]nvoluntariness may be established by a showing that an [employee's] working conditions were made so intolerable that a reasonable person in the [employee's] position would have felt compelled to resign." *Stephens*, 157 F. App'x at 288 (citing *Middleton v. Dep't of Def.*, 185 F.3d 1374, 1379 (Fed. Cir. 1999)). In *Stephens*, a former agency employee who alleged coercion and workplace harassment failed to make this showing, even though presenting allegations of her supervisor's pervasive harassment and the agency's inaction to address it. *Id.* Similarly, in *Vazquez v. Merit Systems Protection Board*, the Federal Circuit affirmed the Merit Systems Protection Board's finding that even though a former civilian engineer allegedly endured a hostile work environment of "racial slurs, insults to his intelligence, and unwarranted reprimands from his supervisors," the Navy did not constructively discharge him because he had the option to seek a transfer instead of resigning. 296 F. App'x 20, 22-24 (Fed. Cir. 2008).

And the Government contends that Banks could have requested an additional equal opportunity investigation or even one conducted by the IGMC, which had substantiated two of his claims from his IGMC complaint. ECF No. 23 at 10 (citing ECF No. 1-2 at 4; ECF No. 22 at 16). But on one occasion Banks "declined to participate" in an equal opportunity investigation of Mr. Lattin's allegedly inappropriate and discriminatory statements. ECF No. 14 ¶¶ 253-55. Even accepting as true Banks's allegations of harassment and coercion in the workplace, this does not establish that he had no alternatives to resigning. Like the former agency employee in *Terban v. Department of Energy*, Banks withstood "unwelcome[d] treatment" and "tolerated a

long period of what he considered to be harassment before finally" resigning, which "indicate[s] that he had an alternative . . . ."  216 F.3d 1021, 1024-25 (Fed. Cir. 2000).

According to Banks, he could not complain to the IGMC because it "ignored" six of the ten claims he submitted in 2013 and was "complicit" in retaliating against him.  ECF No. 22 at 37-8.  But this is an objective test, and his subjective belief is irrelevant.  Specifically, Banks argues that:

> The IG[MC] failed to address the reason why it did not investigate the following six claims:
>
> 1) Rubbed a document vigorously over Banks's head to humiliate him;
>
> 2) Knocked on Banks's head three times with his knuckles after saying "knock on wood" to humiliate him, shortly after calling him a "bitch" for driving over a bump;
>
> 3) Threw a foam "Stress ball" to embarrass him;
>
> 4) Poked Banks in his spine with the tip of a pen during an office meeting;
>
> 5) Sprayed Banks in the groin with a water hose to elicit a laugh (successfully), particularly since Banks is African American and this act is reminiscent of past treatment of African Americans; and
>
> 6) Directed Banks to "sit, heel, stay" as if talking to a dog to humiliate Banks.

ECF No. 14 ¶ 58 (citing ECF No. 1-1).

However, from February to October 2014, the IGMC investigation included interviews with thirteen witnesses and directly addressed all but one of the allegedly ignored claims, as evidenced by the details of witnesses' testimonies contained under the umbrella claim, Allegation 2.  *See id.* ¶ 49; ECF No. 22 at 37-38; *see generally* ECF No. 1-2[7] at 14-20.  During the investigation, no witnesses' testimonies described Banks's head being rubbed.  ECF No. 1-2 at 19.  Although one witness said it sounded familiar, none recalled the foam ball throwing

---

[7] When evaluating a Rule 12(b)(6) motion, the Court may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *A&D Auto Sales, Inc.*, 748 F.3d at 1147).  Banks included the IGMC Report as Exhibit B to his original complaint.  ECF No. 1-2.  When Banks filed his amended complaint, ECF No. 14, he did not refile the exhibits.  But in the amended complaint, Banks specifically incorporates the IGMC Report.  ECF No. 14 ¶¶ 331, 344, 350, 356, 362, 368, 374, 380 (incorporating "Exhibits A-E of the Complaint").  Therefore, the Court may consider the IGMC Report without transforming the Government's motion into a summary judgment motion under RCFC 12(d).

incident.  *Id.* at 18.  One witness recalled an incident where Banks was poked by a pen.  *Id.* at 18.
For the water spraying incident, one witness "interpreted it as a punishment" and "added the
amount of water sprayed . . . was not minimal, and [Banks] appeared embarrassed as a result."
*Id.* at 19; *see also* ECF No. 1-2 at 19-20.  At least one witness "recounted the incident" of Banks
being told to: "Sit.  Heel.  Stay."  *Id.* at 18-19.  Because the IGMC's investigation included these
statements, the evidence refutes Banks's contention that the IGMC ignored his claims.  While it
is true that the IGMC report does not call these out with separate headings or identify them as
claims that were investigated, that does not mean that the IGMC ignored them.  And this also
shows that the IGMC was responsive to complaints and fails to overcome the significant burden
of showing no viable alternative to resignation.

Finally, Banks alleges that he resigned due to a pattern of threats and the future chance of
being "subjected to some adverse action . . . ."  ECF No. 22 at 40.  He insists that he experienced
duress from investigations, decreased performance ratings, and additional duties, which the
Government argues are all insufficient to show that a reasonable person would see no realistic
alternative but to resign.  *See id.* at 33-37; ECF No. 23 at 8.  The Government insists that Banks
fails to allege that he "faced an immediate unfavorable employment action, resulting from an
improper process[,]" which often supports a successful duress claim.  ECF No. 23 at 8; *see, e.g.*,
*Schultz v. U.S. Navy*, 810 F.2d 1133, 1136 (Fed. Cir. 1987) (finding that a plaintiff involuntarily
resigned under duress when facing an immediate adverse action for absence without leave
(AWOL)).  The facts alleged show that Banks had no threat of *any* form of discipline.  His mere
subjective belief that a future involuntary separation was inevitable is not enough because even
"the probability of removal does not convert a voluntary resignation into an involuntary one."
*Bergman*, 28 Fed. Cl. at 587 (citing *Griessenauer v. Dep't of Energy*, 754 F.2d 361, 364 (Fed.
Cir. 1985)).  Here there was nothing that would trigger a removal, much less the probability of it.

In sum, the Court concludes that Banks fails to allege that his resignation was involuntary
under the second *Fruhauf* prong.  Even if perceiving no viable alternative, he chose to not "stand
pat and fight."  *Christie*, 207 Ct. Cl. at 338.  Banks's decision to resign instead of pursuing an
alternative was "a choice that is understandable under the circumstances, but a choice,
nevertheless."  *House*, 99 Fed. Cl. at 352.  Still, Banks's allegations do not establish that his
resignation was involuntary because Banks has not met the substantial burden set by the Federal
Circuit.  If the plaintiffs in *Stephens*, *Terban*, and *Vazquez* fail to meet that bar, Banks must fail
too.  To be clear, none of the conduct that Banks alleges is even remotely acceptable.  That,
however, does not make it sufficient under Federal Circuit precedent to show that his resignation
was involuntary.

        2.     <u>Banks fails to state a claim under the second *Fruhauf* factor, so the Court
need not reach the third *Fruhauf* factor.</u>

The Court need not analyze the third *Fruhauf* factor because Banks has failed to satisfy
the second.  *Bergman*, 28 Fed. Cl. at 585-86 (citing *Info. Sys. & Networks Corp. v. United States*,
994 F.2d 792 (Fed. Cir. 1993) (noting that the *Fruhauf* elements are conjunctive requiring
satisfaction of all three elements to prevail on a claim of duress and government coercion); *see
also Sinclair*, 66 Fed. Cl. at 494, *aff'd*, 192 F. App'x 966 (Fed. Cir. 2006) (omitting analysis of
the third *Fruhauf* factor because the court found there were no adverse circumstances).  Indeed,
the Government does not dispute that Banks alleges facts sufficient to plausibly state a claim

under the third *Fruhauf* factor.  ECF No. 23 at 13.  And the IGMC substantiated two of Banks's allegations.  But the test, which poses a high bar to Plaintiff's claims, remains a conjunctive one.  And the failure to establish the second *Fruhauf* prong obviates the need to consider the third.

**B.      Banks fails to plausibly allege that his resignation was involuntary due to time pressure.**

Another way Banks may rebut the presumption of voluntariness is if he submitted his resignation under time pressure.  *See Scharf v. Dep't of the Air Force*, 710 F.2d 1572, 1574 (Fed. Cir. 1983) (listing an employee submitting their resignation under time pressure as an example of vitiating the element of voluntariness).  But to show a resignation involuntary because of time pressure, Banks must show that the Marine Corps "demanded" Banks "make an immediate decision."  *Staats*, 99 F.3d at 1126 (citing *Latham v. U.S. Postal Serv.*, 909 F.2d 500, 502 (Fed. Cir. 1990)).  And the decision must be truly immediate.  Thus, when the Government forces someone to decide in one day whether to resign, that limited time can render the resignation involuntary.  *Gallucci v. United States*, 41 Fed. Cl. 631, 642 (1998) (citing *Perlman v. United States*, 490 F.2d 928, 932-33 (Ct. Cl. 1974)).  But when someone has as few as three days to decide whether to resign, there likely is no time pressure sufficient to make a resignation involuntary.  *See id.* (citing *McGucken v. United States*, 407 F.2d 1349, 1351 (Ct. Cl. 1969).  And more concretely, "a time frame of approximately three weeks within which to make a decision does not constitute a time pressured decision."  *Id.* (citations omitted).  Banks claims that he faced time pressure to resign because of his potential transfer, private sector hiring timelines, and military termination procedures that take 90 days to complete.  *See* ECF No. 14 ¶¶ 380-83; ECF No. 22 at 55-57.  The Court will address each reason in order.

First, as explained above, the Marine Corps never issued a transfer order to Banks that would move him out of Washington; rather, Banks alleges that in late April 2018, Major Reese told him that "he would *likely* move" to another office as a "summer mover" (*i.e.*, between May and August 2018).  ECF No. 14 ¶ 233 (emphasis added) & n.39.  And Banks alleges that his superiors knew that he could not move away because of his father's condition.  Therefore, when told that the Marine Corps might move him away from Washington, D.C., Banks submitted his resignation at least a few days later, on May 2, 2018.  *Id.* ¶ 236.  The Government maintains that when Banks submitted his resignation, his transfer was merely hypothetical because there was no official order specifying a reassignment location or date.  *See* ECF No. 23 at 13.  Without an official transfer order in place, Banks only had a possibility of reassignment, not the immediate orders necessary to overcome the presumption that his resignation was voluntary.  Indeed, if three days does not constitute time pressure under *McGucken*, resigning in the face of a potential transfer that had yet to materialize cannot suffice to make Banks's resignation involuntary.

Second, Banks cannot claim any time pressure to resign due to law firm hiring practices.  *See* ECF No. 22 at 45-6.  Banks notes that "it can be inferred that law firm hiring has an inherently narrow window of time for a selected candidate to begin working, particularly for lateral movers who often fill gaps."  *Id.* at 46.  However, any time pressure based on law firm hiring is not imposed by the Marine Corps, but rather by the potential private-sector employer.  The Marine Corps has no role in shaping private sector hiring timelines.  Thus, it did not demand his immediate resignation for this reason.

Finally, contrary to Banks's argument, *id.* at 45 (citing Marine Corps Order ("MCO") P1900.16F § 5003(2)) ("Submit requests for resignation . . . not more than 14 months nor less than four months before the requested date of resignation."), the mere fact that the relevant Marine Corps regulation requires advanced notice for resignation does not support a claim of time pressure to resign.  The facts indicate that the time pressure to resign was due to the window of availability to accept a private-sector job.  *See* ECF No. 14 ¶¶ 230-31, 236-37; ECF No. 22 at 45-6; *see also* ECF No. 23 at 12.  This was not the Marine Corps' doing.

Thus, the facts alleged show that nothing the Marine Corps did necessitated Banks's immediate resignation.

**C.      Banks fails to rebut the presumption that his resignation was involuntary on the grounds of deception or misrepresentation.**

Banks also alleges that his resignation was involuntary due to deception or misrepresentation.  *See* ECF No. 14 ¶¶ 344-73.  To overcome the presumption that a resignation is voluntary, a plaintiff has the burden to show that his or her resignation "results from misrepresentation or deception on the part of government officers." *Tippett*, 185 F.3d at 1255, *abrogated on other grounds by Metz*, 466 F.3d 991.  "[A] misrepresentation can be caused by providing misleading information or by failing to provide relevant information." *Id.* (citing *Covington v. Dep't of Health & Human Servs.*, 750 F.2d 937, 943 (Fed. Cir. 1984)).  When the Government provides misleading information to an employee, the plaintiff can overcome the presumption of a voluntary resignation if: (1) "a reasonable person would have been misled by the agency's statements" and (2) that he or she detrimentally relied on those statements.  *Kim*, 47 Fed. Cl. at 501 (quoting *Bergman*, 28 Fed. Cl. at  588).

The alleged misrepresentations at issue in this matter are:

1.   Major Spicer, a reservist whose full-time job was with a private sector law firm "promised and assured Banks of an offer of employment with her law firm if he followed her instructions."  ECF No. 14 ¶ 346; *see also id.* ¶¶ 213-22, 293-301.

2.   Maj. Reeder repeatedly told Maj. Banks that he should resign and seek private sector employment "because of all the opportunity he [Banks] has."  *Id.* ¶ 195; *see also id.* ¶¶ 193-99.  In addition, Maj. Reeder made suggestions about specific opportunities for private sector employment with the firms at which several reservists assigned to the office worked.

3.   Maj. Johnson invited Maj. Banks to his private sector law firm and "made several promises and assurances regarding Banks's ability to work with Johnson's firm if Banks applied."  *Id.* ¶ 202; *see also id.* ¶¶ 200-12, 358.  He also gave Banks instructions on how to apply to his firm.  *Id.* ¶ 358.

4.   Mr. Lattin "promised and assured Banks of an offer of employment with Johnson and Spicer's law firms if (1) he followed Reeder's instructions, (2) applied to Spicer and Johnson's law firms, (3) listed Lattin as a reference, (4) because he is black, and (5) because Lattin has helped lawyers obtain post-service employment in the past . . . ." *Id.* ¶ 364.

5. Mr. McLeod allegedly gave inaccurate advice about how Banks could remain in the Marine Corps until the completion of medical procedures. *Id.* ¶¶ 267-69, 274, 370-72.

A few issues arise at the outset. First, McLeod's representations arose almost three months after Banks submitted his resignation. They arose from a situation wholly unforeseen at the time of Banks's resignation and cannot show it was involuntary. It is undisputed that Banks submitted his resignation on May 2, 2018. *Id.* ¶ 236. The Complaint alleges that Banks's first communication with McLeod did not take place until "on or about August 27, 2018." *Id.* ¶¶ 266-67. As such, no representation McLeod may have made could have influenced Banks to submit his resignation and made an otherwise voluntary resignation involuntary.[8]

Second, given that Spicer, Johnson, and Reeder appear to have been acting on behalf of their private law firms, these were not "the agency's statements." *Kim*, 47 Fed. Cl. at 501. Neither party squarely briefed this issue. The Government contends that under *Lynn* and *Kim*, Banks's misrepresentation claims must fail because "[a]n agency official's statement can never be a misrepresentation where the official lacked authority to make the statement." ECF No. 20 at 16. The Government reads too much into *Lynn* and *Kim*. In *Lynn*, the Court held that an Army retirement analyst's conduct did not constitute a misleading statement regarding retirement rights when he agreed to hold onto and not file a retirement application at a service member's request, but later filed the application pursuant to Army Regulations and without further communication to the service member. 58 Fed. Cl. at 801-03. "Under the applicable regulations, [the former service member] had no authority for his request that [the Army retirement analyst] hold the retirement application, and [the Army retirement analyst] had no authority to do so." *Id.* at 802 (observing that the former service member apparently requested a "favor" from the Army retirement analyst). Similarly, in *Kim* the argument was that the Army personnel should have informed plaintiff of appellate rights to the federal courts. 47 Fed. Cl. at 502. But the Court rejected the argument that the Army had any obligation to advise plaintiff as to her appellate rights in federal court. *Id.* But this does not resolve the question of whether these were "the agency's statements."

Here, Banks alleges that when he spoke with Johnson about working at his law firm, it was over lunch that was "on the firm." ECF No. 14 ¶ 202. Similarly, when discussing potential employment with Spicer, she told him that "she assists recruiting for her firm," and was "recruiting veterans for her firm," *Id.* ¶¶ 216, 348. And Spicer did interview Banks for potential employment "on behalf of her firm." *Id.* ¶ 298. Similarly, Reeder "was assisting with recruitment for his firm as well." *Id.* ¶ 257. It is beyond dispute that if an unrelated law firm offered Banks a job that did not materialize after Banks resigned, the Marine Corps would not be responsible for any misrepresentation. Perhaps because these are statements attributed to reservists, it blurs the line. But given that Banks alleges that these individuals were acting on

---

[8] As explained below, however, the Court is remanding this matter to the BCNR to develop the facts and circumstances surrounding Banks's attempt to delay his resignation due to ongoing medical care. For that analysis, McLeod's representations to Banks are potentially relevant and should be considered. Nothing in this portion of the opinion should be understood to the contrary.

behalf of their private employers, these were not the agency's statements and therefore do not support an involuntary resignation.

>### 1.   A reasonable person would not be misled by the alleged statements made by Majors Spicer, Johnson, and Reeder, and Mr. Lattin.

Even if the representations Banks complains of were attributable to the Marine Corps, his claims would still fail.  For his misrepresentation claims, Banks "must show that 'specific misinformation, deception or improper advice' was given that would have misled a reasonable person."  *Lynn*, 58 Fed. Cl. at 801 (quoting *Heaphy v. United States*, 23 Cl. Ct. 697, 702 (1991)), *aff'd*, 972 F.2d 1355 (Fed. Cir. 1992).  Banks does not need to establish that the agency intentionally misrepresented information to him because "misleading information can be negligently or even innocently provided" by government officers.  *Kim*, 47 Fed. Cl. at 501 (quoting *Covington*, 750 F.2d at 942).  To constitute a misrepresentation by a government officer, a statement should be within the "boundaries of the officer's knowledge."  *Id.* at 502. The Court objectively evaluates misrepresentation or deception claims; thus, neither Banks's subjective perceptions nor the Government's subjective intentions matter.  *Id.* at 501 (citing *Bergman*, 28 Fed. Cl. at 588).

To start, it is not clear how Banks could reasonably rely on Mr. Lattin's assurances of employment with any of the private sector law firms that Banks sought employment with.  Mr. Lattin was a "retired Marine Corps Lieutenant Colonel" that worked in the Marine Corps supervising attorneys.  ECF No. 22 at 32.  But Mr. Lattin was not employed by any of these private law firms.  Similarly, Banks alleges that Reeder made assurances about Banks's opportunities to work at the law firms where Spicer and Johnson worked.  ECF No. 14 ¶¶ 210, 352.  It would be patently unreasonable to rely on assurances of employment with private employers from a person with no apparent ties to those employers.

Putting that aside, Banks argues that he "reasonably relied" on "promises and assurances" of private employment made by Majors Spicer, Reeder, and Johnson and within the boundaries of their knowledge.  *Id.* ¶¶ 348, 354, 360.  In his opposition brief, however, Banks claims that Mr. Lattin and Majors Spicer, Reeder, and Johnson "have knowledge concerning [his] *opportunity* for employment . . . ."  ECF No. 22 at 43 (emphasis added).  According to the Government, this shows that Banks appears to alter his misrepresentation theory from "promises and assurances" of employment to assurances of an "opportunity for employment . . . ."  ECF No. 23 at 14 (citing ECF No. 22 at 43-44).  The Court finds that either theory would fail because Banks presents facts that he *was hired* by a private firm after "numerous opportunities for employment, including multiple meetings and interviews with private law firms."  *Id.* at 20 (citing ECF No. 14 ¶¶ 201–04, 214–22, 295–98, 306).

Specifically, Banks alleges that he "reasonably relied" on statements made by Majors Spicer, Reeder, and Johnson who were all "recruiting veterans" at different big law firms, where each were "directly hired" when successfully transitioning away from active duty and where they each told Banks "he would be hired" also.  ECF No. 14 ¶¶ 348, 354, 360.  Banks insists that these allegations present a genuine dispute of material fact on whether there are misrepresentations within the boundaries of government officers' knowledge, as Majors Spicer, Reeder, and Johnson were aware of his legal talents and knew of his employment opportunities.

ECF No. 22 at 43-44. But statements are not deceptions or misrepresentations simply because Banks *subjectively perceived* that they were unfulfilled promises and assurances of private employment. *See Kim*, 47 Fed. Cl. at 501 (citing *Bergman*, 28 Fed. Cl. at 588) (holding that the subjective perceptions of the employee are not relevant). It is also unclear that any of these individuals had the authority to offer employment on behalf of their law firms. Indeed, while Banks cites their law firm biographies, *see* ECF No. 22 at 43 nn.30-32, he does not explain how it would be reasonable to rely on representations from associate attorneys at multinational law firms that do not list those associates as hiring contacts.

In any event, the Government argues that these alleged promises and assurances for private employment made by Majors Spicer, Reeder, and Johnson and Mr. Lattin do not constitute misrepresentations or deceptions. *See* ECF No. 20 at 16. This is because any statements involving employment opportunities came true since Banks had meetings and interviews with law firms and eventually joined a private firm. ECF No. 23 at 14 (citing ECF No. 14 ¶¶ 201–04, 214–22, 295–98, 306).

The Government further argues that no reasonable person would have relied on the alleged statements "as constituting definitive promises of employment without formal written offer of employment." ECF No. 20 at 17 (collecting cases). As the First Circuit explained in *Sands v. Ridefilm Corp.*, 212 F.3d 657 (1st Cir. 2000), a claim for negligent misrepresentation[9] failed because it would be unreasonable for a plaintiff to detrimentally rely on a corporate vice president's repeated assurance of a job at a company when there was no discussion on employment terms, no agreement on compensation, and there was only an "incomplete, tentative, and unwritten agreement" from their discussions. *Id.* at 664–65. Here, there is not even an allegation of any similarly detailed agreement. While the First Circuit is certainly not binding on this Court, its rationale is persuasive.

Drawing all reasonable inferences in Banks's favor, the Court finds that Banks's allegations do not demonstrate that a reasonable person would be similarly misled by the representations here.

### D. Banks fails to state a claim that his resignation was involuntary due to his failed attempt to withdraw his resignation.

An employee that unsuccessfully attempts to withdraw his or her resignation before its effective date may demonstrate an involuntary resignation. *See Bergman*, 28 Fed. Cl. at 585. But "the mere fact that a request is denied does not automatically rebut the presumption of voluntariness. Plaintiff must also be able to demonstrate that *all the conditions precedent to granting such a request were fulfilled.*" *Gallucci*, 41 Fed. Cl. at 642 (emphasis added and citations omitted). Here, the Government argues that Banks's alleged withdrawal request was merely a "30-day extension request [that] bears no relationship to his claimed relief for two years

---

[9] Under the governing law in *Sands*, a plaintiff must show that he or she reasonably relied on another's statements. 212 F.3d at 664 (citations omitted). Here, Banks also must meet an objective standard and demonstrate his reasonable reliance on the government officers' alleged misrepresentations. Given the similarity of the standards, the First Circuit's analysis is informative, even though not binding.

of back pay and constructive service." ECF No. 20 at 18; *see also* ECF No. 23 at 14 (citing ECF No. 14 ¶¶ 266, 281).

Suffice it to say there is a lot of back-and-forth as to whether Banks attempted to withdraw his resignation or delay his resignation date due to the need for surgery. While in Count VII, Banks alleges that he attempted to "withdraw" his "resignation," ECF No. 14 ¶¶ 376-77, the factual allegations of the Complaint do not support that assertion. Instead, the Complaint alleges that "on or about August 27, 2018, Banks's final week in the Marine Corps, after receiving the requisite written approval from Lattin, *Banks attempted to formally delay his discharge by 30 days*." *Id.* ¶ 266 (emphasis added). And it was this request that Banks pursued with the Marine Corps prior to his resignation became effective, not an attempt to withdraw his resignation. *Id.* ¶¶ 267-82. There is no allegation that Banks sought to withdraw his resignation.

The Government also argues that to the extent this request was a withdrawal request, it was untimely. *See* ECF No. 20 at 19; *see also* ECF No. 23 at 15. According to the Government, Banks's "withdrawal request" that was "made after his resignation was accepted and a discharge date established, came too late and has 'no bearing on the voluntariness of his prior resignation.'" ECF No. 20 at 19 (quoting *Brown v. United States*, 30 Fed. Cl. 227, 230-31 (1993), *aff'd* 26 F.3d 139 (Fed. Cir. 1994)); *see also* ECF No. 23 at 21. The Court in *Brown* held that the service member's withdrawal request that was made forty days after his resignation was accepted and thirty-five days before his discharge date "had no bearing upon the voluntariness of his prior resignation." *Brown*, 30 Fed. Cl. at 231 (finding that a service member's resignation withdrawal request was untimely "even if the Army had determined that plaintiff's case presented reason to grant an exception and withdraw his prior termination"), *aff'd*, 26 F.3d 139 (Fed. Cir. 1994). Here, Banks submitted his resignation request on May 2, 2018. ECF No. 14 ¶ 236. He also submitted his purported withdrawal request "on or about August 27, 2018," *i.e.*, four days before his discharge date of August 31, 2018. *See id.* ¶¶ 266, 282. The Government counters that the request to delay a resignation has no bearing here because "[h]e submitted his extension request after his resignation had been accepted and his discharge date set." ECF No. 23 at 15 (citing ECF No. 14 ¶¶ 264–66, 273, 282). Given that the timing of Banks's attempt to extend his tenure was nearly three months after his resignation and was for medical treatment that he did not contemplate when he resigned in May 2018, it "had no bearing upon the voluntariness of his prior resignation." *Brown*, 30 Fed. Cl. at 231.

### E.   Banks adequately pleads that the Marine Corps violated its regulations regarding retention of Marines undergoing medical treatment by discharging Banks while he was undergoing medical treatment.

While Banks may not have attempted to withdraw his resignation, that does not end the inquiry because Banks adequately alleges that the Marine Corps violated its regulations by discharging him when he was undergoing medical treatment despite his request to extend his active duty until completion of his medical care. ECF No. 22 at 28; *see also* ECF No. 14 ¶¶ 263–282, 374–79. While Banks may couch this argument in the context of an attempt to withdraw his resignation rather than a violation of regulation, given the "less stringent" standard applied to pro se litigants the Court considers his allegation as one alleging the Marine Corps violated its own regulations when discharging him. *See Estelle*, 429 U.S. at 106 (quoting *Haines*, 404 U.S. at 520-21).

The applicable regulation states:

> 1.   A Marine *may be retained for the convenience of the U.S. Government* beyond the established separation date in the following cases:
>
> > a.   Hospitalized, undergoing medical treatment, or not physically qualified for release (see paragraph 1011).  A Marine on active duty who is hospitalized, undergoing medical treatment, or who is found not physically qualified for release *will*, *with the Marine's written consent, . . . be retained* on active duty until disposition of the case is made by medical authorities . . . .

MCO P1900.16F ch. 2, § 1008(1)(a) (February 15, 2019) (emphasis added).  The Parties dispute the relative import of the emphasized language of this regulation.

During his final medical exam before the effective date of his resignation, Banks learned from the Marine Corps' doctors of his need for surgery, and Banks attempted to remain in the Marine Corps until he recuperated from this procedure.  ECF No. 14 ¶¶ 263–82.  Indeed, the Government does not challenge that Banks was undergoing medical treatment at the time of his discharge.  Under this regulation, Banks argues that he did not need to make any formal request and that he only had to "consent to being retained on active duty" to meet "all the conditions precedent to granting such a request . . . ."  *Gallucci*, 41 Fed. Cl. at 64; ECF No. 22 at 29.  While the Government does not address this regulation in briefing, at oral argument, the Government stated that:

> The first substantive clause of that regulation is that a Marine may be retained for the convenience of the U.S. Government beyond the established separation date in the following cases, and then it itemizes a series of cases in which case the Marines are authorized to retain a service member for the convenience of the Government.

ECF No. 35 at 68:21–69:1.  The Government emphasized that this regulation addresses some examples where "the Government may exercise, at its discretion, the option to keep a service member on active duty."  *Id.* at 69:5–8.

The Court agrees that at first glance, paragraph 1 suggests that the retention of a Marine Corps officer beyond the established separation date is first and foremost "for the convenience of the U.S. Government . . . ."  MCO P1900.16F ch. 2, § 1008(1)(a) (February 15, 2019).  While not a model of clarity, the mandatory nature of subparagraph a's provision that a Marine "will, with the Marine's written consent, be retained" makes it clear that if Banks consented in writing, the Marine Corps would retain him for some period of time.  Here, there is no dispute that Banks clearly alleges that he submitted a written request to be retained beyond his initial resignation date of August 31, 2018.  ECF No. 14 ¶ 266; ECF No. 35 at 52:22–53:266, 270.

For these reasons, the Court finds that Banks states a plausible claim that the Marine Corps improperly discharged Banks while he was undergoing medical treatment based on its regulation.

**IV.      Remand is appropriate.**

The Parties vigorously dispute whether an administrative record is proper in a case such as this where the plaintiff did not seek administrative relief prior to coming to this Court, and whether discovery is appropriate in a military pay case.  ECF No. 22 at 26-27; *see generally* ECF Nos. 22, 23 at 23-25 & 37.  And according to the Government, it has submitted Banks's personnel file and it does not establish that "Mr. Banks attempted to withdraw his resignation." ECF No. 23 at 21.  The Court need not wade into the dispute about the appropriateness of an administrative record or discovery in this case.  As can be seen above, the Court has not relied on anything in the Government's "administrative record" in resolving this case.

But the Government contends that if the Court denies any portion of its motion to dismiss, the proper course would be to remand this matter to the BCNR.  *Id.* at 24 (citing *Prochazka v. United States*, 90 Fed. Cl. 481, 496 (2009)).  "In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."  28 U.S.C. § 1491(a)(2).  As explained above, the issue here is whether the Marine Corps improperly discharged Banks while he was undergoing medical treatment and, if so, what he is entitled to as a result, if anything. Here, there are significant questions whether the Marine Corps followed its regulations when discharging Banks and the factual circumstances surrounding his attempts to delay his discharge. In these circumstances, the Court finds it proper and just to remand to the BCNR for it to develop the record and determine how long Banks would have been retained in the Marine Corps in the first instance.

Banks objects to remand because this case presents several "special circumstances" that advise against a remand to the BCNR.  *See* ECF No. 22 at 26.  First, he argues that "[e]very decision by the BCNR, though presented to a board, is made by its director."  *Id.* at 26.  Because Mr. Lattin, in his role, advises the BCNR and defends its decisions in Federal courts, Banks insists that "an unbiased decision – good or bad – is unlikely."  *Id.*; *see* ECF No. 14 ¶ 239 n.41. And Banks argues that Mr. Lattin would not support Banks here because he previously advised the BCNR to reject Banks's previous claim.  ECF No. 22 at 26 ("Moreover, Lattin previously advised the BCNR to reject a previous request made by Banks.").  The Government counters that "[a]ny demonstrable bias by the board would be grounds for reversal, incentivizing the board to avoid bias and conflicts of interest."  ECF No. 23 at 24 (citing *Bond v. United States*, 47 Fed. Cl. 641, 653-54 (2000)).  The Government also notes that "[i]n this case, *several* attorneys mentioned in Mr. Banks's complaint, who would ordinarily be involved in the case, have recused themselves."  *Id.* n.4 (emphasis added).  While it is not clear what the Government means by "several" attorneys have recused themselves, *all* attorneys against whom Banks has made allegations in his complaint *must be recused* from this case when it is remanded to the BCNR. This measure will appropriately address the risks of bias and conflicts of interest.  But as the Government mentioned, should the results be untenable, the Court will determine whether the BCNR's determination "is arbitrary, capricious, contrary to law, or unsupported by substantial evidence."  *Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005).

Second, Banks maintains that a remand would initiate a futile and predicable IGMC investigation.  *See* ECF No. 22 at 27 (citing 10 U.S.C. § 1034(c) and (d)).  He says that his allegations that the IGMC retaliated against him and failed to investigate all his claims in the

prior investigation results in a "direct conflict of interest . . . ." *Id.* But given the Court's resolution of the claims about retaliatory investigations, the remand will only address whether the Marine Corps improperly discharged Banks while he was receiving medical care. Thus, the IGMC need not address anything because of the remand.

Third, Banks argues against a remand because "the Government has already taken the legal position that Banks's discharge was voluntary." *Id.* at 26. This argument misses the point, however, because it assumes that the issue for remand is whether Banks's resignation was voluntary. As explained above, it is not. None of these reasons present unusual circumstances that render remand inappropriate.

## V.     The remaining motions.

In addition to the Government's motion to dismiss and Banks's cross motion, there are also two more motions pending. First, the Government filed a motion to supplement the administrative record. ECF No. 25. Given the Court's determination to remand to the BCNR, the motion to supplement the record is denied as moot. Any development of the record shall be done before the BCNR.

Second, Banks has filed a motion to refer this matter to mediation. ECF No. 36. Given that the Government opposes mediation in this matter at this time, the Court cannot refer it to mediation, which is a voluntary process. Therefore, the Court must deny this motion.

## VI.    Conclusion

For the foregoing reasons, the Court:

1. Grants-in-Part and Denies-in-Part the Government's motion to dismiss, ECF No. 20;

2. Denies Banks's cross motion for partial summary judgment, ECF No. 22;

3. Denies as moot the Government's motion to supplement the administrative record, ECF No. 25;

4. Denies Banks's opposed motion to refer this matter to mediation, ECF No. 36; and

5. Remands this matter to the Board for Correction of Naval Records (BCNR).

In conducting this remand, the BCNR shall, consistent with this opinion:

a. Determine how much time it took for Plaintiff to recuperate from his surgery and when, if the Marine Corps had retained him, his medical doctors would have cleared his resignation under MCO P1900.16F ch. 2, § 1008(1)(a).

b. Determine how much back pay Plaintiff is entitled to if it determines that the Marine Corps discharged Banks in violation of MCO P1900.16F ch. 2, § 1008(1)(a).

Pursuant to RCFC 52.2, the Court further orders that remand proceedings shall be completed within 120 days of this decision.  The Court will retain jurisdiction over the case during the remand proceedings and STAYS proceedings in this case during the remand.  Finally, the parties shall file notice with the Court within thirty days of the BCNR's decision on remand stating whether that decision affords a satisfactory basis for the disposition of the case and whether the parties require further proceedings before this Court.

The Clerk is directed to serve this Opinion and Order on the Board for Correction of Naval Records at the following address:

Department of the Navy
Board for Correction of Naval Records
701 S. Courthouse Road
Building 12, Suite 1001
Arlington, VA 22204-2490

IT IS SO ORDERED.

s/ Edward H. Meyers
Edward H. Meyers
Judge